IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Chief Judge

Civil Case No.  05-cv-01011-LTB-OES

JERRY CROKER, On Behalf of Himself and All Others Similarly Situated,

Plaintiff,

v.

CARRIER ACCESS CORPORATION,
ROGER L. KOENIG,
NANCY G. PIERCE, and
TIMOTHY R. ANDERSON,

Defendants.

---

# ORDER

---

The plaintiffs have filed an Amended Complaint consisting of 102 pages, which the defendants describe as prolix.  Whether prolix, ponderous, or panoptic, the document is insufficiently detailed to satisfy the defendants, who move in two separate motions for dismissal on the ground that the allegations are not particular.  The motions are adequately briefed and oral argument would not materially aid their resolution.

The motion of the defendants Carrier Access Corporation ("Carrier"), Roger L. Koenig, and Nancy G. Pierce presents the question how much precision the Private Securities Litigation Reform Act of 1995 ("PSLRA") requires of claimants attempting to state claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and the Securities and Exchange Commission's Rule 10(b)(5), 17 C.F.R. § 240.10b-5.  Specifically, is it sufficient for a plaintiff to plead facts giving rise to inferences supporting the claim, or must the plaintiff foreclose with

direct allegations possible inferences that favor the defendants?  For the reasons stated below, I find that the plaintiffs' allegations give rise to permissible inferences and I DENY the motion.

The allegations demonstrate a lack of scientor on the part of defendant Timothy R. Anderson as to certain misstatements.  His motion to dismiss is GRANTED in part and DENIED in part.

## I.  Allegations

The following allegations appear in the Amended Complaint, construed in the light most favorable to the plaintiffs.  The plaintiffs represent a putative class of persons who between October 21, 2003 and May 20, 2005 purchased publicly-traded securities issued by Carrier.  They challenge the veracity and completeness of statements that Carrier made during fiscal years 2003 and 2004.  Specifically, they allege that 1) Carrier overstated earnings in contravention of Generally Accepted Accounting Principles ("GAAP") and rules of the United States Securities and Exchange Commission ("SEC") and 2) Carrier failed to disclose material facts that adversely affected its ability profitably to sell its products.

Carrier produces and sells to telephone service providers converged access equipment, which enables the providers to offer voice and data services on a single network.  The company's stock is traded on the NASDAQ exchange.

Defendant Koenig is Carrier's Chief Executive Officer ("CEO"), President, and Chairman of its board of directors.  He is alleged to have signed Carrier's registration statements, certifications under the Sarbanes-Oxley Act, and other reports to the SEC.  He issued press releases and communicated with investors concerning Carrier's business practices and financial condition.

Defendant Pierce, Mr. Koenig's wife, is a member of Carrier's board and has served variously as Carrier's Chief Financial Officer ("CFO") – from September, 1992 until April, 2000 and again since November, 2004 – and Corporate Development Officer ("CDO") – between April, 2000 and November, 2004.  Ms. Pierce allegedly reviewed and signed Carrier's registration statements, reports, and Sarbanes-Oxley certificates and held herself out to the investing public as one knowledgeable about the company's finances.

Defendant Anderson, a certified public accountant, was Carrier's Controller and CFO until he resigned in November, 2004.  He also purportedly signed the company's sundry reports and SEC filings.

In 2002, Carrier allegedly began to target wireless service carriers.  Publicly, the company soon declared this strategy successful.  On October 21, 2003, Carrier reported to the press that its revenues had grown 31 % during the third quarter of 2003.  On November 14, 2003, Carrier certified that result to the SEC in its quarterly Form 10-Q filing.  On January 20, 2004, Carrier declared in a press release that it had enjoyed a 46 % increase in revenue during the fourth quarter of 2003 and a 24.5 % increase in fiscal year 2003 over fiscal year 2002.  These results Carrier certified in a 10-Q filing, signed by defendants Koenig, Pierce, and Anderson, on March 30, 2004.  Mr. Koenig attributed this growth to Carrier's overtures toward the wireless market, which campaign he characterized as "a clear winner."  As a result of the reports, the price of Carrier's stock rose.

The plaintiffs allege that this appearance of success depended upon a falsity.  In the third and fourth quarters of 2003, Carrier allegedly recognized revenue for products the title and risk of loss for which had not yet passed to customers, and engaged in other perfidy.  It allegedly

3

overstated its third quarter net revenue by 8.5 %.  For fiscal year 2003, Carrier overstated its net income by 62.6 % and its earnings per share by 66.7 %.

By April 2004, Carrier had allegedly saturated its target market; its products occupied most, if not all, available cell facilities.  Carrier was at that time attempting to develop a new technology, called FLEXEngine, which would increase its customers' capacity to handle wireless communications.  A market existed for FLEXEngine; customers allegedly "were begging" for the product.  Carrier promised to deliver the product in the third quarter of 2004.  However, according to a confidential witness quoted in the Amended Complaint, Carrier was in April, 2004 experiencing difficulties developing FLEXEngine and Carrier engineers informed Mr. Koenig that Carrier would not meet its delivery deadline.  This information Koenig disclosed neither to Carrier's customers nor to its investors.

Allegedly to conceal its financial woes, Carrier continued to overstate its revenues, income, and earnings.  During the second quarter of 2004, Carrier recognized $1.1 million in phantom revenue.  Statements of net income and earnings for that quarter exceeded the actual amounts by 23.7 % and 22.2 %, respectively.  Statements in the first and third quarters of 2004 slightly understated Carrier's income.  Carrier stock continued to trade at its allegedly inflated prices.

On July 20, 2004, Carrier announced that it would not be able to project earnings for the third quarter of 2004.  The market immediately responded to this announcement; the value of Carrier's stock fell 37 % on July 21, 2004.  Carrier still did not disclose that its FLEXEngine product would not be available on time.  On September 8, 2004, it publicly predicted a fifteen- to twenty-percent decline in revenue from the second to the third quarter of 2004, but forecast an

increase in revenues for the fourth quarter of 2004.  Further optimistic assessments ensued.

In the fourth quarter of 2004, Carrier allegedly claimed four million dollars of revenue and two million in income from an equipment sale to a thinly-capitalized distributor not capable of completing the purchase.  The feigned transaction allegedly was constructed to appear as a sale to an affiliate of Verizon Wireless for Verizon's consumption.  In fact, however, Verizon did not intend to take title to or deploy the equipment until late in 2005.  The affiliate had no purchasing power – possessed limited credit and capital – but gave Carrier the pretense of having delivered the product on an accelerated schedule.  Mr. Anderson allegedly informed Mr. Koenig that recognizing revenue from this transaction would violate GAAP.  Mr. Koenig allegedly persisted and Mr. Anderson resigned on November 18, 2004 out of ostensible concern over the impropriety.  Ms. Pierce, who succeeded Mr. Anderson as interim CFO, acquiesced in the purported artifice.  Upon announcement of Mr. Anderson's departure, despite public assurances by Ms. Pierce that the event was in no way related to accounting problems, Carrier's stock lost another 9 % in value.

On January 25, 2005, Carrier reported net losses during the fourth quarter of 2004 of $1.5 million.  The plaintiffs allege that fourth quarter losses were much greater, and that the company overstated its net income and earnings per share by 59.6 % and 63.6 %, respectively.  Though Carrier originally reported profits in fiscal year 2004, it actually suffered losses of $1.8 million.  It overstated its fiscal year 2004 income by 150.5% and its 2004 earnings by 160 %.

Blanket accusations give the appearance of concerted fraudulent efforts among Carrier's three top officers.  During the class period, defendants Koenig, Pierce, and Anderson allegedly sold 730,000 shares of Carrier stock, individually held, and recognized $8.7 million in proceeds

before the value of the stock declined.  The shares the defendants sold fetched an average of $12.03.  After the defendants' alleged frauds were revealed, between May 20, 2005 and August 19, 2005, Carrier stock traded at an average of $5.16 per share.  On November 25, 2003, Carrier acquired a company called Paragon, paying with shares of its own stock, the price of which was at that time allegedly artificially inflated.  In January, 2004, Carrier made a secondary stock offering at the inflated price.

However, particular allegations belie the illusion of a united scheme.  Mr. Koenig and Ms. Pierce, husband and wife, allegedly sold 43,500 shares of Carrier stock between October 21, 2003 and November 26, 2003, while the price of the stock was inflated due to Carrier's allegedly fraudulent third quarter 2003 reports.  They sold 94,500 shares between December 1, 2003 and February 27, 2003, cashing in on inflation resulting from the allegedly fraudulent fourth quarter reports.  They sold additional shares in the spring of 2004.  They then sold 142,687 shares between June 3, 2004 and July 6, 2004, just prior to Carrier's July 20 announcement, which caused the value of its stock to deflate by more than a third.

By contrast, Mr. Anderson sold no shares of Carrier stock between October 21, 2003 and April 1, 2004.  Between April 29, 2004 and July 6, 2004, he sold 87,687 shares.  He sold approximately 80,000 shares on November 30, 2004, after resigning his position with Carrier.

Over the ensuing months, Carrier issued disappointing revenue reports and its stock continued to lose value – 53 % between November, 2004 and May, 2005.  In May, 2005, Carrier had still not delivered the FLEXEngine product.  Its Chief Technical Officer then resigned, allegedly as a result of that failing.

On May 2, 2005, Carrier announced that it would conduct a review of its transactions and

6

revenue recognition from 2003 and 2004.  On May 20, 2005, it announced that it would restate

its financial data from 2003 and 2004.  Its stock dropped another 11.3 %.  On August 2, 2005, it

published the restatement, correcting the previous overstatements and promising reforms to

correct "material weakness" in its internal controls, accounting procedures, and accounting

personnel.

The Amended Complaint identifies five confidential witnesses by their positions within the

company and recites their representations concerning defendants Koenig's, Pierce's, and

Anderson's involvement in, and knowledge of, the alleged misrepresentations.  Confidential

Witness One ("CW1"), a chief sales and technical officer at Carrier from November, 2003 until

May, 2005, states that throughout April and May of 2004, members of the engineering

department informed Mr. Koenig that development of the FLEXEngine product was behind

schedule and that Carrier would not meet its delivery deadline.  He represents that Mr. Koenig

and Ms. Pierce had full knowledge of and approved the sham $4 million sale late in 2004.  He

states that Mr. Koenig, Ms. Pierce, and Mr. Anderson personally reviewed and familiarized

themselves with the terms of contracts with Carrier's customers.  He insinuates that Mr. Koenig

and Ms. Pierce were the sources of misstatements concerning projected sales that Carrier

allegedly made during the summer of 2004, but does not reveal the grounds for this attribution.

Confidential Witness Two ("CW2"), a former Vice President of Engineering, ascribes to

Mr. Koenig mismanagement that resulted in Carrier's failure timely to develop the FLEXEngine

product.  During the putative class period, CW2 participated in weekly conferences with Mr.

Koenig, Ms. Pierce, and Mr. Anderson concerning Carrier's shortfalls and proposed remedies.

CW2 confirms that Mr. Anderson openly disagreed with accounting decisions that Mr. Koenig

and Ms. Pierce made, but does not give any indication that any of the individual defendants had knowledge of the alleged misrepresentations or their falsity.

Confidential Witness Three ("CW3"), director of Carrier's international expansion sales during the class period, does not add to an understanding of the defendants' knowledge or activities during the class period, except to represent that Mr. Koenig and Ms. Pierce "micro-managed" Carrier. CW3 asserts that Mr. Koenig and Ms. Pierce "did whatever was necessary to make quarterly revenue targets."

Confidential Witness Four ("CW4"), a former chief engineer, asserts that Mr. Anderson and Ms. Pierce "were responsible for and had full knowledge of all financial matters at the company." CW4 does not disclose the basis for this representation. Confidential Witness Five ("CW5"), a senior accountant with Carrier before the class period, presents a conflicting view, stating that Ms. Pierce "had the ultimate word on everything financial" and that Mr. Anderson "could not close a quarter without Pierce's imprimatur because Pierce held ultimate authority for the Company's financial reporting."

The plaintiffs state claims for violations of Section 10(b) of the Exchange Act and Rule 10(b)(5), liability as controlling persons under Section 20(a) of the Exchange Act, and contemporaneous insider trading in violation of Section 20A of the Exchange Act. In support of the third claim, they allege to have purchased shares of Carrier stock on various dates in November of 2003 and January and April of 2004.

**II. Discussion**

Under Fed. R. Civ. P. 12(b)(6), a district court may dismiss a complaint for failure to state a claim upon which relief can be granted if it appears beyond doubt that the plaintiff can prove no

set of facts in support of his claim which would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). If the plaintiff has pled facts that would support a legally cognizable claim for relief, a motion to dismiss should be denied. *See id*. In evaluating a 12(b)(6) motion to dismiss, "all well-pleaded factual allegations in the... complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *Sutton v. Utah State Sch. for Deaf and Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).

Fed. R. Civ. P. 9(b) provides, "In all averments of fraud... the circumstances constituting fraud... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." More specifically, in order to plead fraud with particularity, a complaint must "'set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'" *Koch v. Koch Indus. Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (quoting *Lawrence Nat'l Bank v. Edmonds (In re Edmonds)*, 924 F.2d 176, 180 (10th Cir. 1991)). The purpose of Rule 9(b) is "to afford defendant fair notice of plaintiff's claims and the factual ground upon which [they] are based... ." *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 987 (10th Cir. 1992).

A.      **Section 10(b) claim**

The defendants offer several arguments in support of dismissal of the first claim. As to their alleged failure to reveal the market-saturation and product-development problems, they assert that 1) the plaintiffs have failed to plead with particularity the existence of false or misleading statements, 2) any misstatements come under the PSLRA's safe harbor protection and the "bespeaks caution" doctrine, 3) the plaintiffs have failed adequately to plead scientor, and 4) the plaintiffs have failed to plead loss causation. The defendants do not dispute that they

9

misstated the company's financial conditions in 2003 and 2004, but argue that the plaintiffs have failed adequately to allege scientor as to those misstatements.

### 1.  Omissions concerning demand for product

First, the defendants argue that the plaintiffs fail to identify with sufficient particularity any false statements concerning demand for Carrier's products.  They assert that, assuming that the market for existing products was saturated in 2004, they made no statements to the contrary.  Nor, they point out, do the plaintiffs identify any public statements by any defendant concerning development of the FLEXEngine product.  Citing *In re Splash Technology Holdings, Inc. Securities Litigation*, 160 F. Supp. 2d 1059, 1074 (N.D. Cal. 2001), they argue that the plaintiffs have left to this Court the tasks of identifying the allegedly misleading statements and matching those statements with the facts that make them misleading.

The defendants are pummeling a straw man.  The plaintiffs allege not that the defendants made false statements concerning demand for their products but rather that they omitted to disclose information that they had a duty to reveal.  Plaintiffs may state claims under Section 10(b) and Rule 10(b)(5) for material omissions that constitute manipulative or deceptive practices. *Jensen v. Kimble*, 1 F.3d 1073, 1077 (10th Cir. 1993).  To succeed on their claim, the plaintiffs must prove that: 1) the defendants failed to state a material fact; 2) the defendants acted with intent to deceive or defraud; and 3) the plaintiffs relied upon the misrepresentations and sustained damages as a proximate result.  *O'Connor v. R.F. Lafferty & Co., Inc.*, 965 F.2d 893, 897 (10th Cir. 1992).

A failure to disclose is actionable under Section 10(b) when the defendants are under a duty to disclose the information. *Windon Third Oil and Gas Drilling Partnership v. Federal*

*Deposit Ins. Corp.*, 805 F.2d 342, 347 (10th Cir. 1986), *cert. denied*, 480 U.S. 947, 107 S. Ct. 1605, 94 L. Ed. 2d 791 (1987). The duty arises from a fiduciary or other, similar relation of trust and confidence between the parties. *Id.*; *S.E.C. v. Cochran*, 214 F.3d 1261, 1264-1265 (10th Cir. 2000). Where, as here, the defendants created a market for Carrier stock by their actions and statements – promising delivery of FLEXEngine to customers by the third quarter of 2004, reporting revenue from previous sales of converged access equipment – and thus induced the plaintiffs to purchase the stock, a jury could find that the defendants had a duty to make a full and truthful disclosure of the facts, allegedly known to Mr. Koenig in April, 2004, that the market for Carrier's then-existing products was exhausted and that the new product, FLEXEngine, would not be ready in time for its promised delivery. *See*, *Alter v. DBLKM, Inc.*, 840 F. Supp. 799, 807-808 (D. Colo. 1993); *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 382-383 (S.D.N.Y. 2003).

The defendants do not dispute that, as officers of Carrier, they owed a common law fiduciary duty to Carrier's shareholders. Instead, they assert in reply that "defendants here had no duty to disclose a problem that did not exist." They contest the plaintiffs' allegations that Carrier's failure to meet its earnings goals in the third quarter of 2004 resulted from its failure timely to deliver the FLEXEngine product. However, that is a fact question and is not an appropriate point of resolution on these motions.

Second, the defendants assert that their forward-looking statements, accompanied by cautionary disclaimers, were protected under the PSLRA's safe harbor provision and the "bespeaks caution" doctrine. 15 U.S.C. § 78u-5(c); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1120 (10th Cir. 1997). However, the question before me is not whether Carrier's optimistic

11

assessments throughout 2003 and 2004 constituted misrepresentations.  Rather, the issue is

whether, in light of those assessments and its dependence upon future sales of its converged

access product, Carrier created for itself a duty to disclose information that belied its putative

optimism.

Third, the defendants argue that the plaintiffs have failed sufficiently to allege scientor.

Though neither Ms. Pierce nor Mr. Anderson is alleged to have been specifically told about the

market saturation or the problems Carrier was experiencing with FLEXEngine, both are alleged

to have participated in conferences in which Carrier's woes were discussed.  CW1 reports that

Ms. Pierce and Mr. Anderson personally reviewed Carrier's contracts and were familiar with the

terms.  These allegations raise a strong inference that Ms. Pierce and Mr. Anderson knew about

Carrier's impending product failure.

As to Mr. Koenig, the defendants' argument is meritless.  Mr. Koenig was Carrier's CEO,

and the only fair and reasonable inference is that he knew the status of the development of the one

product on which Carrier's future profitability depended.  Additionally, confidential witnesses

claim to have told Mr. Koenig specifically about the FLEXEngine development issues in April,

2004.  *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003).

Finally, the defendants argue that the plaintiffs have failed to plead loss causation.  They

assert that disclosure of their inability to meet the FLEXEngine delivery deadline caused no

decline in the value of Carrier's stock because no such disclosure ever occurred.  They point out

that the company's stock declined in connection with other disclosures, such as the July 20, 2004

earnings announcement and the November 18, 2004 resignation of Mr. Anderson.  They cite

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)

for the proposition that an allegation of an artificially inflated stock purchase price resulting from a fraudulent omission is insufficient to plead loss causation.  They point out that "to establish loss causation, 'a plaintiff must allege... that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *In re Initial Public Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (emphasis original) (*quoting Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005), *cert. denied*, 126 S. Ct. 421, 163 L. Ed. 2d 321 (2005)).

As a factual matter, the defendants misrepresent the allegations.  The Amended Complaint states that after Carrier missed its delivery deadline – the passing of the deadline without the promised event constituted a revelation of the failed development of the FLEXEngine product, whether or not Carrier explicitly acknowledged the failure – the value of the stock continued to decline: 53 % before May, 2005, when Carrier's Chief Technical Officer resigned.  Thus, the plaintiffs have pled a causal connection between the alleged FLEXEngine misrepresentations and at least some portion of their loss.

More fundamentally, the defendants again misapprehend the plaintiffs' allegations and thus propose an excessively formal definition of the subject of the fraudulent statement.  The reason – indeed, the only sensible reason – why investors would be interested in the status of Carrier's product development would be to enable them accurately to assess Carrier's earnings projections and prospects for future, unprojected earnings.  The gravamen of the plaintiffs' complaint is not that Mr. Koenig and Carrier were secretive concerning a particular product, but rather that Mr. Koenig knew in April, 2004 that the assumptions upon which Carrier's strategy and future

13

profitability were premised had proven unworkable. Mr. Koenig did not publicly disclose

Carrier's inability to meet third quarter 2004 projections until July 20, 2004. This case is thus

unlike *Dura Pharmaceuticals*; the plaintiffs are alleged to have suffered loss when Carrier

disclosed its inability to forecast its third quarter sales and it stock depreciated by 37 % in one

day. Whether the omission violated Section 10(b) and whether it caused the plaintiffs' alleged

losses are fact questions to be litigated. *In re Rhythms Sec. Litig.*, 300 F. Supp. 2d 1081, 1092

(D. Colo. 2004).

2.      **Financial misstatements**

As to the financial misstatements in 2003 and 2004, the defendants dispute that the

plaintiffs have alleged scientor with sufficient particularity. They point out that "allegations of

GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities

fraud claim." *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1261 (10th Cir.

2001) (*quoting Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000), *cert. denied*, 531 U.S. 1012,

121 S. Ct. 567, 148 L. Ed. 2d 486 (2000)). "Only where such allegations are coupled with

evidence that the violations or irregularities were the result of the defendant's fraudulent intent to

mislead investors may they be sufficient to state a claim." *Id*. This is equally true where, as here,

the defendant corporation restates its financial data as a result of the irregularities. *In re Sun*

*Healthcare Group, Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1297 (D.N.M. 2002).

The PSLRA provides,

In any private action arising under this chapter in which the plaintiff may recover money
damages only on proof that the defendant acted with a particular state of mind, the
complaint shall, with respect to each act or omission alleged to violate this chapter, state
with particularity facts giving rise to a strong inference that the defendant acted with the
required state of mind.

14

15 U.S.C. § 78u-4(b)(2).  It also demands dismissal of any complaint that does not provide the requisite particularity.  15 U.S.C. § 78u-4(b)(3)(A).

The scientor required to establish a Section 10(b) claim is a mental state embracing intent to deceive, manipulate, or defraud, which includes recklessness.  *Fleming*, 264 F.3d at 1259. Recklessness is "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *Id*. at 1260 (*quoting Anixter v. Home-Stake Production Co.*, 77 F.3d 1215, 1232 (10th Cir. 1996)).

Scientor is evaluated with reference "to the totality of the pleadings to determine whether the plaintiffs' allegations permit a strong inference of fraudulent intent."  *Fleming*, 264 F.3d at 1262.  Allegations of motive and opportunity, though typically not sufficient in themselves to establish a strong inference of scientor, "may be considered as part of the mix of information that can come together to create the 'strong inference' of scientor required by the PSLRA."  *Id*. at 1262, 1263.  I am to consider both the inferences that the plaintiffs suggest and other possible inferences, including those adverse to the plaintiffs, and to determine whether the plaintiffs' suggested inferences are strong in light of the overall context.  *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1187-1188 (10th Cir. 2003).

The plaintiffs identify several particular allegations that, when taken together, they argue, give rise to a strong inference of scientor.  First, they point to the alleged magnitude of the accounting discrepancies – sixty-two percent of net income in 2003 and one hundred fifty percent of net income in 2004; a reported net profit in 2004 that was actually a net loss.  Second, citing *Kinder-Morgan, Inc.*, 340 F.3d at 1105-1106, they point out that GAAP violations, such as those

15

alleged here, strengthen an inference of scientor.  Third, the individual defendants are alleged to have occupied senior executive positions within Carrier, and thus are presumed, the plaintiffs argue, to have known the facts that Carrier misrepresented.  Fourth, the plaintiffs assert that the defendants' insider stock trades and Carrier's stock offering and acquisition of Paragon demonstrate a motive to defraud investors.  Fifth, they assert that Carrier's Sarbanes-Oxley certifications strengthen the inference that the defendants knew of the accounting irregularities. Finally, they point out that Mr. Anderson specifically informed Mr. Koenig in November, 2004 that the sham Verizon transaction violated GAAP principles.

Neither the defendants nor the plaintiffs analyze these factors properly.  The defendants challenge each allegation individually, correctly but misguidedly asserting that none of the allegations by itself is sufficient to establish scientor.  This approach is inconsistent with the Tenth Circuit's admonition to "examine the plaintiff's allegations in their entirety, without regard to whether those allegations fall into defined, formalistic categories... and determine whether the plaintiffs' allegations, taken as a whole, give rise to a strong inference of scientor."  *Fleming*, 264 F.3d at 1263.

The plaintiffs would have me conflate the scientor of the four defendants and assign to all knowledge that can be attributed to any.  Group-published statements are attributable to all of Carrier's officers.  *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1254 (10th Cir. 1997); *Schaffer v. Evolving Systems, Inc.*, 29 F. Supp. 2d 1213, 1225 & n.5 (D. Colo. 1998); *In re Ribozyme Pharmaceuticals, Inc. Securities Litigation*, 119 F. Supp. 2d 1156, 1166 (D. Colo. 2000).  However, demonstration of scientor requires proof both that each individual defendant was aware of Carrier's statement and that each defendant was aware of the purportedly contrary

16

facts.  Thus, the plaintiffs must allege that each individual defendant involved in the statement was aware of the statement's falsity.  *In re Qwest Communications Intern., Inc. Securities Litigation*, 387 F. Supp. 2d 1130, 1145 (D. Colo. 2005).

The plaintiffs have sufficiently alleged that Mr. Koenig and Ms. Pierce acted with the requisite scientor.  Whether or not Mr. Koenig and Ms. Pierce knowingly exaggerated Carrier's earnings in 2003 and the second quarter of 2004, they are alleged to have known specifically that the fourth quarter 2004 statement was fraudulent.  Mr. Anderson allegedly told Mr. Koenig in November that Carrier could not recognize the $4 million from the putative Verizon transaction without violating GAAP principles.  Mr. Koenig issued the statement anyway.  Ms. Pierce, who allegedly oversaw all financial matters at Carrier and to whom Mr. Anderson allegedly reported, signed the fourth quarter 2004 statement as interim CFO after Mr. Anderson allegedly resigned in protest.  These facts, together with the magnitude of the misstatement, the positions of authority that Mr. Koenig and Ms. Pierce occupied within the company, the motive and opportunity that they enjoyed, and the Sarbanes-Oxley certificates that they signed, give rise to a strong inference of scientor.  *Kinder-Morgan*, 340 F.3d at 1090-1091.

The opposite inference – that Mr. Koenig and Ms. Pierce were unaware of the wrongfulness of recognizing the revenue from the putative Verizon deal and similar transactions – simply is not a reasonable conclusion from the allegations of the Amended Complaint.  The November, 2004 conversation between Mr. Anderson and Mr. Koenig, in particular, forecloses that inference.

Mr. Koenig and Ms. Pierce contest the purported magnitude of Carrier's financial misstatements.  They do not dispute that Carrier overstated its net income by 62.6 % in 2003 and

150.5 % in 2004. Instead, they argue that revenue makes a better measure of magnitude than net income. They assert that Carrier overstated its revenue by only 0.1 % in 2003 and 6.2 % in 2004. As an initial matter, I cannot resolve any factual dispute over the amount of the restatements on motions to dismiss; I am obliged to take the plaintiffs' well-pled allegations as true. Beyond that, a 6.2 % overstatement of annual revenue is not insignificant. Much of that overstatement – $4 million – originated in the single, fourth-quarter report on the putative Verizon sale. For those reasons, the defendants' claims are insufficient to warrant dismissal of the Section 10(b) claim.

Furthermore, though authorities in other circuits divide on the question whether net income or revenue is the better measure of magnitude, I need not look to other circuits; courts in this circuit refer to net income. *Kinder-Morgan*, 340 F.3d at 1090-1091; *In re Accelr8 Technology Corp. Sec. Litig.*, 147 F. Supp. 2d 1049, 1055 (D. Colo. 2001).

Mr. Koenig and Ms. Pierce dispute that their execution of Sarbanes-Oxley certifications, in which they personally vouched for Carrier's internal controls, has any bearing upon their scientor. They point out that all chief executives of publicly-traded companies are required to sign Sarbanes-Oxley representations, and argue, "If such certifications raised a strong inference of scientor, every corporate officer who signed a certification for a filing subsequently found incorrect would be subject to a securities fraud action." This claim is simply incorrect. Sarbanes-Oxley certifications do not create strict liability for corporate officers. Rather, they constitute one factor among many that courts may consider, in the totality of the circumstances, to evaluate scientor. For that reason, I concur with the District of Oregon, which in a recent decision considered the execution of Sarbanes-Oxley certifications indicative of an individual defendant's knowledge about a company's business success and financial data. *In re Lattice Semiconductor*

*Corporation Sec. Litig.*, 2006 WL 538756, *14, *17-*18 (D. Or. 2006).

The defendants cite *Limantour v. Cray Inc.*, – F. Supp. 2d –, 2006 WL 1169791 (W.D. Wash. 2006). However, the plaintiffs in that case alleged that the defendants made misstatements in the Sarbanes-Oxley certifications themselves. The decision does not support the defendants' argument.

The defendants assert that their stock sales were accomplished by third parties under Rule 10b-5-1 trading plans and thus cannot give rise to an inference of motive. The plaintiffs challenge this assertion, claiming that Mr. Koenig and Ms. Pierce actually exercised control over the entity that sold their stock. The parties will, no doubt, explore this issue in discovery. I cannot resolve the matter on motions to dismiss.

Finally, the defendants argue that, notwithstanding the allegations that combine to raise an inference of scientor, the plaintiffs' direct allegations of Mr. Koenig's and Ms. Pierce's knowledge are insufficient. They fault the plaintiffs for failing "to allege with specificity (or otherwise) how or why defendants somehow knew of these deficiencies before May 2005 when they reported the necessity of a restatement." They ask,

> How did Koenig and Pierce know [the Verizon affiliate] had "limited credit?" What document did they see or author? What conversation did they have? Who informed them of [the affiliate's] "limited credit?" Plaintiffs don't say. Nor do they give an ounce of support to their allegation that Koenig and Pierce "authorized" the immediate shipment of product to [the Verizon affiliate] because it would "accelerate" revenue. "Accelerate how? Plaintiffs never say.

They conclude that the account in the Amended Complaint is too vague to satisfy the PSLRA.

The defendants cite *Sorkin, LLC v. Fischer Imaging Corp.*, 2005 WL 1459735 (D. Colo. 2005); *In re Northpoint Communs. Group Sec. Litig.*, 184 F. Supp. 2d 991 (N.D. Cal. 2001); *In*

*re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063 (N.D. Cal. 2002); *Gibson v. Vanisi*, 2005 WL 165382 (D. Utah 2005); and other decisions.  They read these decisions to require that a plaintiff's complaint mimic a newspaper article, specifying the what, where, when, why, and how of each discrete communication and transaction of which the fraud was constituted. However, that understanding would render the authorities meaningless.  As set forth above, the Tenth Circuit requires district courts to draw reasonable inferences from indirect allegations when direct allegations of scientor are unavailable.  Requiring plaintiffs to set forth in their complaints each and every piece of evidence demonstrating the fraudulent event would be tantamount to trying the case at the pleadings stage, which is verboten.  *Kinder-Morgan*, 340 F.3d at 1101.

Though some question arguably persists as to what degree of specificity the PSLRA requires of claimants, the defendant's argument has no merit.  The PSLRA codified for Section 10(b) claimants the strictures of Fed. R. Civ. P. 9(b).  *Schaffer*, 29 F. Supp. 2d at 1225 & n.5; *Rhythms*, 300 F. Supp. 2d at 1086 n.2 & 1087-1088.  Neither Rule 9(b) nor the PSLRA requires plaintiffs to plead their evidence in the complaint.  *Kinder-Morgan*, 340 F.3d at 1101.  As the Tenth Circuit has explained,

> While the PSLRA certainly heightened pleading standards for securities fraud lawsuits, we believe that if Congress had intended in securities fraud lawsuits to abolish the concept of notice pleading that underlies the Federal Rules of Civil Procedure, Congress would have done so explicitly.  "Clearly, the Reform Act requires some precision in alleging facts, however, it does not require pleading all of the evidence and proof thereunder supporting a plaintiff's claim."

*Id*. (*quoting In re Cephalon Sec. Litig.*, 1997 WL 570918 (E.D. Pa. 1997)).

The allegations of the Amended Complaint paint a different picture with respect to Mr. Anderson.  The magnitude of any overstatements does not assist the plaintiffs because Carrier

made its largest overstatements at the end of the fourth quarter of 2004, after Mr. Anderson left the company.  Indeed, Mr. Anderson is alleged to have objected to the Verizon transaction and to have resigned rather than participate in it.  And misstatements in the first and third quarters of 2004 are alleged to have resulted in *understatements* of income.  Any 2003 overstatements preceded Mr. Anderson's first stock sales by more than four months.  *See Limantour*, 2006 WL 1169791 at *27.

Thus, no pattern of consistent overstatements for which Mr. Anderson might be responsible appears.  Nor did Mr. Anderson profit from most of the overstatements that preceded the fourth quarter of 2004.  Mr. Anderson's November 30, 2004 stock sale gives rise to two inferences, one favoring the plaintiffs – he wanted to cash in before the previous year's overstatements became known – the other favoring Mr. Anderson – he sold his stock as a routine aspect of leaving the company.  Taken together, the totality of the allegations does not give rise to a strong inference of scientor.

**B.      Section 20(a) claim**

The plaintiffs have alleged controlling person claims against Mr. Koenig and Ms. Pierce. However, Mr. Anderson is not alleged to have exercised any authority over those who made decisions to overstate earnings.  Indeed, he is alleged to have answered directly to Ms. Pierce, who had final authority over all financial decisions.

**C.      Section 20A claim**

The plaintiffs' insider trading claim fails against Mr. Anderson because none of the

plaintiffs is alleged to have purchased Carrier stock contemporaneously with any of Mr.

Anderson's sales of stock.  15 U.S.C. § 78t-1(a); *In re Qwest Comms. Int'l, Inc.*, 396 F. Supp. 2d

1178, 1201 (D. Colo. 2004).  Indeed, all of the plaintiffs' purchases are alleged to have occurred

at least twenty-seven days before, or fifteen days after, Mr. Anderson's sales.  Most of the

purchases occurred months before and after Mr. Anderson's sales.  Whatever period of time

contemporaneity encompasses, it cannot be stretched to include the intervals alleged here.

The contemporaneity requirement:

> proceeds from a recognition that '[s]ince identifying the party in actual privity with the
> insider is virtually impossible in transactions occurring on an anonymous public market,
> the contemporaneous standard was developed as a more feasible avenue by which to sue
> insiders.' ...  Thus, by requiring a showing of contemporaneity in the trades by the insider
> and the suing investor, Section 20A seeks to ensure that, where contractual privity would
> otherwise be impractical if not impossible to show, there nonetheless was a sufficiently
> close temporal relationship between the trades that the investor's interests were implicated
> by trades made by the insider while in possession of material, nonpublic information.

*In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 662 (E.D. Va. 2000) (citations

omitted).

The greater the period of time contemporaneity is expanded to cover, the less efficacious

is its use as a proxy for actual privity.  *See In re AST Research Sec. Litig.*, 887 F. Supp. 231, 234

(C.D. Cal. 1995).  Thus, many courts have sensibly interpreted the requirement to amount to

hours or days, not weeks or months.  *See, e.g.*, *AST*, 887 F. Supp. at 234 (trades must occur on

the same day); *Copland v. Grumet*, 88 F. Supp. 2d 326, 338 (D.N.J. 1999) (two-day interval not

contemporaneous); *In Re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576

(S.D. Tex. 2003) ("two or three days, certainly less than a week, constitute a reasonable period to measure" contemporaneity); *MicroStrategy*, 115 F. Supp. 2d at 663-664.  And as the *MicroStrategy* court recognized,

> an evolution of the contemporaneity requirement to require a shorter temporal separation between the trades of investors and insiders is reasonable, if not inevitable, as the modern realities of the securities markets support an increasingly strict application of contemporaneity in order at once to satisfy the requirement's privity-substitute function and to guard against "mak[ing] the insider liable to all the world."

*MicroStrategy*, 115 F. Supp. 2d at 663.  I find that reasoning persuasive and therefore dismiss the Section 20A claim against Mr. Anderson.

Mr. Koenig and Ms. Pierce move for dismissal of the Section 20A claim against them on two grounds.  First, they assert that the plaintiffs have failed to plead a predicate violation of the Exchange Act.  However, as set forth above, the plaintiffs have successfully pled violations of Section 10(b) and Rule 10(b)(5) against these defendants.  *MicroStrategy*, 115 F. Supp. 2d at 662.  Second, they argue that the plaintiffs lack standing to assert Section 20A claims on behalf of the putative class.  However, class certification issues will await resolution until later stages of the proceedings.

Accordingly, it is ORDERED that:

1) the dismissal motion of Carrier, Mr. Koenig, and Ms. Pierce is DENIED;

2) Mr. Anderson's motion to dismiss is GRANTED in part and DENIED in part;

3) the first claim against Mr. Anderson, for violation of Section 10(b) is DISMISSED only to the extent that it is predicated upon the financial misstatements; and

4) the second and third claims against Mr. Anderson are DISMISSED.


Dated: July __18__, 2006, in Denver, Colorado.

                                             BY THE COURT:


                                             ___s/Lewis T. Babcock_____
                                             Lewis T. Babcock, Chief Judge